18 January 8, 2015 No. 3

## IN THE OREGON TAX COURT
## REGULAR DIVISION

Stuart ETTER,
*Plaintiff,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC 5027)

Plaintiff (taxpayer) appealed from a Magistrate Division decision denying him the benefit of federal legislation limiting state taxation of airline employees. Granting the department's motion for summary judgment, the court ruled that taxpayer, who is not a member of a flight crew with scheduled flights throughout a year, but rather makes limited and episodic flights, was not afforded the benefit of the federal statute.

Oral argument on parties' motions for summary judgment was held May 28, 2013, in the courtroom of the Oregon Tax Court, Salem.

Gregory P. Bessert, Attorney at Law, Battle Ground, filed the motion and argued the cause for Plaintiff (taxpayer).

James C. Wallace, Senior Assistant Attorney General, Department of Justice, Salem, filed the motion argued the cause for Defendant Department of Revenue (the department).

Decision for Defendant rendered January 8, 2015.

**HENRY C. BREITHAUPT, Judge.**

### I. INTRODUCTION

In this case the issue is whether Plaintiff (taxpayer) may benefit from the provisions of a federal law that limits the extent to which states may impose taxation on the wage income of certain employees of air carriers.[1] The statute in question is 49 USC section 40116(f) (the federal statute), that provides, in relevant part:

---

[1] There has been some question as to which years are at issue in this case. That matter will be resolved, if necessary, in the form of judgment entered. The applicable law has not varied among the years.

"(1)   In this subsection—

"(A)   'pay' means money received by an employee for services.

"(B)   'State' means a State of the United States, the District of Columbia, and a territory or possession of the United States.

"(C)   an employee is deemed to have earned 50 percent of the employee's pay in a State or political subdivision of a State in which the scheduled flight time of the employee in the State or subdivision is more than 50 percent of the total scheduled flight time of the employee when employed during the calendar year.

"(2)   The pay of an employee of an air carrier having regularly assigned duties on aircraft in at least 2 States is subject to the income tax laws of only the following:

"(A)   the State or political subdivision of the State that is the residence of the employee.

"(B)   the State or political subdivision of the State in which the employee earns more than 50 percent of the pay received by the employee from the carrier.

"(3)   Compensation paid by an air carrier to an employee described in subsection (a) in connection with such employee's authorized leave or other authorized absence from regular duties on the carrier's aircraft in order to perform services on behalf of the employee's airline union shall be subject to the income tax laws of only the following:

"(A)   The State or political subdivision of the State that is the residence of the employee.

"(B)   The State or political subdivision of the State in which the employee's scheduled flight time would have been more than 50 percent of the employee's total scheduled flight time for the calendar year had the employee been engaged full time in the performance of regularly assigned duties on the carrier's aircraft."

Defendant Department of Revenue (the department) asserts that taxpayer does not qualify for the benefits of the federal statute. Taxpayer argues that he qualifies for the benefits of the federal statute. Initially taxpayer asserted that the department bore the burden of proof in this matter. Taxpayer has withdrawn that argument, an act consistent

with the provisions of ORS 305.427 (burden of proof in the Tax Court to be borne by party seeking affirmative relief).

## II.   FACTS

The following facts are the subject of a stipulation of the parties.

(1)   Taxpayer was a resident of the State of Washington during the year at issue.

(2)   Horizon Air Industries, Inc. (Horizon Air), a Washington corporation, employed taxpayer as an aircraft dispatcher during the year at issue.

(3)   At all times during the year at issue, Horizon Air was in the business of providing air transportation of passengers or property by aircraft as a common carrier for compensation between a place in a state, territory, or possession of the United States and a place in the District of Columbia or another state, territory, or possession of the United States.

(4)   At all times during the year at issue, Horizon Air was authorized by the US Department of Transportation, Federal Aviation Administration under Air Carrier Certificate QXEA002A, effective as of August 31, 1981, to conduct business as an interstate air carrier under the authority of the Federal Aviation Act of 1958, as amended, and the rules, regulations, and standards prescribed thereunder.

(5)   During the year at issue, the terms of taxpayer's employment included fulfillment of all duties set forth for aircraft dispatchers in the Horizon Air Dispatch Standards Manual. The terms of taxpayer's employment as an aircraft dispatcher for Horizon Air also included terms and conditions of employment in addition to the duties expressed and set forth for aircraft dispatchers in the Horizon Air Dispatch Standards Manual. Those additional terms and conditions are set forth in the Horizon Air Employee Policy Manual and the collective bargaining agreement between Horizon Air and the Transport Workers Union of America, AFL-CIO. Failure to fulfill duties set forth for aircraft dispatchers in the Horizon Air Dispatch Standards Manual or satisfy the terms

and conditions of the Horizon Air Employee Policy Manual or the collective bargaining agreement between Horizon Air and the Transport Workers Union of America, AFL-CIO constituted grounds for termination of employment.

(6)    During the year at issue, taxpayer earned income in Oregon as an aircraft dispatcher for Horizon Air at its Portland, Oregon, operations center.

(7)    As a dispatcher, taxpayer's primary and regular duties were to plan and monitor flights from Horizon Air's Portland operations center.

(8)    Horizon Air required that all of its dispatchers be qualified in accordance with Federal Aviation Regulation (FAR) 121.463.

(9)    The required time spent observing operations could be satisfied either on board the aircraft or in a flight simulator.

(10)    Horizon Air did not have a flight simulator.

(11)    Taxpayer monitored aircraft from two (2) aircraft groups.

(12)    Taxpayer fulfilled the FAR qualification requirement that he observe flight deck operations of the aircraft that he monitored by flying on Horizon Air aircraft during the year at issue for each of the two groups of aircraft taxpayer monitored, which resulted in no more than taking one flight during one day in each of the two types of aircraft taxpayer monitored.

(13)    Taxpayer's labor contract provided that "[a]n employee who is required to complete jump seat observation training may elect to accomplish the requirement on a flight of his or her own choosing," and, consequently, taxpayer could have chosen flights for his training purposes that occurred 100 percent over Oregon.

(14)    Taxpayer's Oregon source pay for the year at issue was greater than 50 percent of taxpayer's total pay. For purposes of this paragraph, the term "pay" shall have the meaning set forth in 49 USC § 40116(f)(2).

## III.   ISSUE

For purposes of these cross-motions for summary judgment the parties, in hearings supplemental to the filing of briefs, have agreed that the issues before the court at this point are limited to: (1) assuming that taxpayer had "assigned duties," were they regularly assigned? And (2) is the benefit of the federal law only available to crew members of planes of air carriers? Because the resolution of the second question is dispositive, the court will not address the first of these questions.

## IV.   ANALYSIS

In construing the federal statute, the court follows the methods used by federal courts. *Butler v. Dept. of Rev.*, 14 OTR 195, 199 (1997) (citations omitted).  This court understands this method to include consideration of the text, context and legislative history of the federal statute.[2] *See, e.g.*, *Lamie v. United States Trustee*, 540 US 526, 534-36, 539, 124 S Ct 1023, 157 L Ed 2d 1024 (2004) (consideration of text and context, and legislative history if plain meaning of text is ambiguous or history bolsters plain meaning).

In accordance with these methods, the court observes that the language of the federal statute does not explicitly limit its coverage to members of plane crews. However, the federal statute purports to apply to all employees of an air carrier. Rather, the coverage of the federal statute is stated as applying to employees of an air carrier "who have regularly assigned duties on aircraft in at least 2 states."

Importantly, however, the federal statute contains other provisions that provide an important context. The first of these is found in paragraph (1)(C). The second is found in paragraph (3)(B).

---

[2] Taxpayer has made an argument that recent case law from the United States Supreme Court has changed the approach to construction of federal statutes limiting the power of states to impose taxes. The court does not find that argument persuasive. The issue remains as always the intent of Congress. However, the court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly expressed. *See Julian v Dept. of Rev.,* 339 Or 232, 235-36, 118 P3d 798 (2005) (citing *California Equalization Bd. v. Sierra Summit*, 490 US 844, 851-52, 109 S Ct 2228, 104 L Ed 2d 910 (1989)).

Both of these provisions contain the phrase "flight time." However, in neither case is that phrase qualified with the phrase "regularly assigned." Rather, the qualifier as to "flight time" is "scheduled." In the federal statute "duties" are "regularly assigned." In contrast, "flight time" is "scheduled." Additionally, in both provisions, the measurement period for flight time is a full calendar year.

Finally, paragraph (3)(B) calls for a calculation of a hypothetical number based on an assumption that, rather than performing union services, the employee had been engaged in the performance of "regularly assigned duties." The premise of the federal statute is that the employee otherwise covered by the statute would be scheduled to fly during the entire year. Using that schedule for any period of union service, one simply interpolates into the period of time of union service the times and places the employee would have flown but for the union service. The result is an expression of the "full time" duties of the employee in question, on the basis of which it will be determined in or over which state, if any, the employee earned more than 50 percent of the pay received by the employee from the carrier.

These provisions supply an important context for interpreting or construing the operative provisions of paragraph (2) of the federal statute. None of them apply at all well with an employee, such as taxpayer, who is not a member of a flight crew with scheduled flights throughout a year, but rather makes limited and episodic flights.

As to the provisions of paragraph (3)(B), even if one assumes that taxpayer is "assigned" to a flight for purposes of obtaining qualifications that the employer finds important and that such flights are considered "duties," it would be illogical to combine a very limited number of episodic activities (in this case two days in a year) with the remainder of taxpayer's regular duties throughout the year in order to express what taxpayer's "full time" activities were for a year. The special rule of paragraph (3)(B) was written to allow an appropriate calculation for an employee whose regular flight schedule would interfere with the performance of union duties. The special rule is a solid basis for a reading of the federal statute as applying to flight crew members whose

yearlong duties must be calculated by replacing ground duty time with deemed flying.

The context provided by paragraph (3)(B) very strongly, if not conclusively, suggests that the intent of Congress in the federal statute was for its benefits to be available to crew members but not to other employees of an air carrier who may, from time to time and relatively rarely, find themselves on an aircraft for some job-related reason.

Additionally, under the federal statute, calculations are only done for flight time that is "scheduled." The ordinary meaning of the word "scheduled" is: "place[d] in a schedule." *Webster's Third New Int'l Dictionary* 2028 (unabridged ed 2002). Schedule, in turn, is defined, in relevant part, as "a transportation timetable \* \* \* requiring to be dealt with usu. at a particular time or within an indicated *period*." *Id*. (Emphasis added.)

The federal statute contemplates a schedule of flying for a period, a year—one that can be referred to after the fact for purposes of making the paragraph (3)(B) calculation for that yearlong period. That is, paragraph (3)(B) calls for a calculation made on the assumption that union activity time could be assigned to what had otherwise been a set of scheduled flights over particular states.

Stated differently, the federal statute, read as a whole, equates "regularly assigned duties" to duties that are "scheduled" to occur throughout a calendar year. That equation can be applied to members of flight crews without difficulty. To the extent that taxpayer has a schedule that applies to his work, it is a schedule that has him located on the ground in Portland, Oregon. Application to taxpayer of the statutory equation of "regularly assigned duties" and "scheduled flight time" cannot be sensibly applied.

It is beyond question that the calculation of "regular" duties of an employee must consider what the employee does over the course of a calendar year. That is what paragraph (3)(B) contemplates in its required calculation. There can be no question that, over the period of the calendar year in question, the regular duties of taxpayer were to perform

dispatching functions from a location on the ground in Portland, Oregon.

The legislative history of the federal statute and related federal legislation supports the foregoing conclusions regarding congressional intent.[3]

In hearings leading up to the adoption of the federal statute the House of Representatives issued a report that stated:

> "'A multiplicity of laws and regulations for the administration and enforcement of State tax laws and regulations can obviously cause unnecessary friction and confusion within the framework of interstate commerce, impede the free flow of trade between the several States, and constitute a serious burden on interstate commerce. For illustrations of the multiplicity of State laws see the appendix of their report. A good example of the lengths to which this multiplicity of administration and enforcement could lead is illustrated by the schedules of operations in the air transportation industry. It is possible for a crew to have monthly schedules requiring flights between New York, Pittsburgh, Chicago, Omaha, Denver, Salt Lake City, and San Francisco. At the end of the month, that crew would have flown over or through most of the States. Obviously, for each carrier to have to prorate that crew's withholding, giving each State flown over a certain percentage, could create a serious burden on interstate commerce.' H.R. Rpt. 91-1195 at 3 (June 15, 1970) (Comm. on Interstate and Foreign Commerce, State Income Tax Withholding for Interstate Transportation Employees, Washington D.C. Government Printing Office, 1970)."

Although this report deals with the difficulties related to employer withholding obligations in states, taxpayer recognizes in his briefing that the concerns apply equally to the issue of the tax liability of the employee.

---

[3] In briefing, taxpayer alludes to Congressional intent as to legislation adopted after the decision of the United States Supreme Court in *Northwestern States Portland Cement Co. v. Minnesota*, 358 US 450, 3 L Ed 2d 421, 79 S Ct 357 (1959). That case did not concern employees of interstate transportation companies. Substantial time passed before Congress addressed the problems presented by state taxation of such transportation employees. Accordingly this court looks to the legislative history of the particular Congressional action taken as to such employees and not to the controversy and legislation surrounding the *Northwestern States* case.

In the Senate floor debate preceding the adoption of the federal statute, Senators Humphrey and Stevens engaged in an exchange, as follows:

"'*Mr. Humphrey*:   Mr. President, it seems certain states are attempting to tax the earnings of members of *aircrews* who are not residents of their States, to impose an income tax on those persons even though they do not reside in the State. They are attempting to levy this tax. As a matter of fact, the situation has reached a point now that some States are proposing to tax the earnings of *aircrews* in proportion to the amount of time an airplane may have spent in the airspace of that State, irrespective of whether or not the member of the *aircrew* resides in that State.

"'So we are reaching a pretty ridiculous situation.

"'My amendment would amend the Federal Aviation Act of 1958 such that States would be prohibited from taxing income of members of *aircrews* unless they lived within the boundaries of that State.

"'*  *  *  *  *

"'*Mr. Stevens*:   I certainly would agree with the Senator's amendment if it is limited to compensation derived from activity as an *airline pilot*. Some of the brethren if [*sic*] the Senator's profession have been very successful and own some lodges and other things up my way. I think if they earn income other than from flying they should pay some State in which the income is derived. But if it is derived from the occupation of an *airline pilot*, I would certainly agree. Is the amendment so limited?

"'*Mr. Humphrey*:   Yes, as a matter of fact, the language states: 'No part of the compensation paid by an air carrier to an employee who performs his regularly assigned duties,' et cetera.

"'*Mr. Cannon*:   Mr. President, I have discussed this amendment with the Senator. We attempted to correct this problem a few years ago and at that time in conference the language was changed to make it none of the compensation could be withheld or subjected to State withholding. But it certainly was the intent of this body that they could not be subject to taxation.' 125 Cong. Rec. 9175 (1979) *Aviation Safety and Noise Abatement Act of 1979* Pub. L. No. 96-193,

94 Stat. 50 (1980); S. 413 96th Cong. Feb. 9, 1979 (Statement by Sen. Humphrey Minnesota).”

(Emphases added.) This legislative history indicates that the senators discussing the matter on the floor considered both the problem and the statutory solution to be focused on and limited to the compensation of crew members.

The text and context of the federal statute as well as the legislative history of the provisions fully supports the conclusion that the federal statute only applies to members of an airplane crew of an air carrier who fly on a scheduled basis.

## V.   CONCLUSION

For the foregoing reasons, the motion of the department is granted and the motion of the taxpayer is denied. Taxpayer does not qualify for the protections of the federal statute. Now, therefore,

IT IS ORDERED that the motion of Plaintiff is denied; and

IT IS FURTHER ORDERED that the motion of Defendant is granted.